STAPLES, J.,
delivered the opinion of the court.
The appellant claims under John C. Edwards, who purchased from his brother. Nathaniel Edwards, in the year 1860. At the time of this purchase the land was subject to four deeds of trust: the first and second of which were for the benefit of Dr. Tames Cornick. the third for the benefit of the Portsmouth Orphan Asylum, and the fourth for the benefit of Beaton’s estate. John C. Edwards, after his purchase, paid a part of the debts secured by the Cornick deeds, and the appellant, as his assignee, now claims to be substituted to the lien of those deeds, and thus to obtain priority over the debt due the *69 Orphan Asylum. The fund being insufficient to pay all the liens, it becomes important to determine its proper application.
The evidence shows that John C. Edwards, when he made the purchase, was fully apprized of the existence *of these deeds of trust. Indeed, the conveyance from Nathaniel Edwards to him declares that it is made subject to them. Although John C. Edwards does not expressly undertake to pay them, there is no doubt that such was the understanding of the parties. His deposition was taken by consent, and in it he gives a history of the transaction. He states that both as endorser and surety he was responsible for his brother to a considerable amount, along with A. Emmerson and George W. Grice; that before his brother’s death the latter, without consultation with the witness and without his knowledge, had the deed prepared; that witness was sent for to go to Emmerson’s office, and he (Emmerson) explained that if the witness paid all the debts mentioned, and the mortgages, then the land would belong to witness. The latter said the land was not worth it. He, however, signed the deed, agreeing to pay all the debts of Nathaniel Edwards, for which Emmerson, Grice and himself were bound. From this it is apparent that while John C. Edwards expressed the opinion that the value of the land was not equal to the debts, he nevertheless consented to the arrangement, and agreed to take the land upon the terms suggested, [f he was not willing to accede to these terms, he ought to have said so and refused to sign the deed. Further on in his deposition he admits, on cross-examination, the only benefit he expected at the time to derive from the purchase was whatever might remain from the sale of the land “after the payment of the deeds of trust.” I do not think Nathaniel Edwards would have sold the land, except with the understanding that, as between him and the purchaser, the land was to remain the primary fund for the payment of the incumbrances. It is very certain that John C. Edwards would never have paid his brother the full value of the land, with the incumbrances upon it, and trusted solely to the covenants in the deed for his indemnity. Whilst, therefore, John C. Edwards did not make himself personally liable for the trust debts, it is very certain, I think, they were considered a part of the purchase money, and that he agreed to take the land, and, as he himself states, rely for his indemnity upon any surplus remaining after satisfying the incumbrances. As a general rule, a conveyance of property subject to a mortgage imposes no personal liability on the grantee. It, however, raises a presumption that the purchaser buys the property to the extent stated, and that he takes his chances of realizing out of the property enough, over and above the mortgage, to indemnify him for his advance of purchase money. The fair inference is, that the purchaser does not pay the vendor the full value of the property, but that the amount of the mortgage debt is reserved in his hands as so much purchase money for the purpose of discharging the lien. In such case, the land conveyed is as effectually charged with the amount of the mortgage as if the purchaser had expressly assumed its payment. As between the vendor and the purchaser of the equity of redemption, the land is the primary fund for the liquidation of the incumbrance. See Daniel v. Leitch, 13 Gratt. 195, 206; Jumel v. Jumel, 7 Paige R. 591, 11 Paige 28; Stebbins v. Hall, 29 Barb. R. 524; Jones on Mortgages, §§ 736, 740-8-9, 756.
In Wedge v. Moore, 6 Cush. R. 8-10, Chief Justice Shaw, in discussing the rights of the purchaser who had discharged the mortgage and claimed the benefit of it, said: “'Such a payment made no difference. He (the purchaser) took his conveyance subject to that incumbrance, and it may be presumed that the consideration paid was less by the amount of that incumbrance than he otherwise would have paid, tie paid off the incumbrance to clear his own estate and took a discharge. The tenant (that is the purchaser) must have agreed to pay off and discharge this mortgage as part of the purchase, *for otherwise he would, if evicted, have had a remedy under his general or special warranty against the grantor. The fact that the tenant obtained a discharge of the mortgage and did not take an assignment, leads to the conclusion that he was to pay the mortgage himself as in effect part of the purchase money.” These observations are as directly applicable to (he present case as to the one in which they were made. They relieve me of the necessity of any further discussion of this branch of the case. See also Eaton v. Simonds, 14 Pick. R. 98; Thompson v. Chandler, 7 Greenl. R. 377, In Spengler v. Snapp. 5 Leigh 678, Judge Carr said Joseph Stover bought the land under his deed of trust with proclamation that it was sold subject to Christian’s mortgages. These mortgages then became a part of the purchase money which Joseph Stover gave for the land.
We have still further proof that John C, Edwards was to pay off and discharge (he deeds of trust as part of the purchase money for the land. It appears that for ten successive years, commencing in 1860 and ending in 1870, he made payments to the Orphan Asylum upon the debt due that institution, amounting in the aggregate, principal and interest, to nearly two thousand dollars. According to the present pretension, he was under no obligation to make these payments. Why, then, did he make them? How can they be accounted for, except upon the supposition that the trust debts constituted a part of the purchase money, and as such he had agreed to pay them, and he well understood it was only by paying them (prior and subsequent) he could obtain a valid title to the land? His conduct in other respects sustains this view. For from 1860 down to 1871 he never, at any time during all that period, claimed that he could hold the Cornick deeds of trust for his own benefit, so far as he had paid them, to the entire exclusion of the Orphan Asylum. Not until the spring *70 of 1871, after the *land was sold and the proceeds in the hands of the trustee for distribution, was this claim asserted. It is clearly an after-thought growing out of the decline -in the value of the land, and the failure of the security. In opposition to .this view it is said that the value of the land would not have justified John C. Edwards in paying the incumbrances. Let us see how this is. The trust debts in round numbers amounted to a.bout nine thousand dollars. The debts for which he was bound as security amounted to about four thousand dollars — in all, thirteen thousand dollars, and certainly a very liberal estimate. The only evidence we have of the value of the lands is that of John C. Edwards, who proves ■ that his brother received an offer for it of twenty-two • thousand dollars two years before the war, and refused it. This statement is not contradicted or impugned in any respect. There is no countervailing testimony, and it must lie taken as proof of the value.
It is very true that John C. Edwards, in I860, offered the land for sale and received1 a bid of only eight thousand and five hundred dollars. But he of course intended to sell, as he had bought, subject to the incumbrances, and the purchaser, in making his bid, would necessarily make allowance for them. The bid was therefore practically an offer of $31,500.
It is also true that at the sale made in 1871, under the first incumbrances, the property sold for seven thousand and five hundred dollars. This, however, is obviously no fair test of the value in 1860. It is in proof that the federal forces were in possession of the land from May, 1863, to October, 1865. They destroyed all the out-buildings of the value of three or four thousand dollars. They cut down or destroyed all the timber of the value of four or five thousand dollars. The amount of damage otherwise necessarily inflicted by such people in four years is simply incalculable, besides the decline in real estate *in every part of the country resulting from the war. And yet, notwithstanding all this, the property at a cash sale in 1871 brought seven thousand and five hundred dollars. • These facts conclusively show that at the time of the purchase by John C. Edwards, in 1860. he could, upon any reasonable calculation, take the land, pay the trust debts and the debts for which he was bound as security, and still have in his hands a sufficient surplus to compensate him for the trouble and risk he incurred. He had also further indemnity in a deed of trust executed by Nathaniel Edwards upon a negro man, the stock of horses, and the chattels upon the land which, if sold before the war, would have realized a considerable amount. It is safe to say, that if the war had not occurred we should never have heard of this controversv. as we should never have heard of a multitude of others originating in unfortunate land speculations. If the times had proved propitious, the transaction would have been an advantageous one to John C. Edwards. But the great disaster befell the country, and his investment proved an unfortunate one. Much has been said of the injustice done in permitting the Orphan Asylum to reap the benefit of the payments made upon the first deeds of trust It is a sufficient answer that John C. Edwards stood in the shoes of his vendor, and in making the payments he was simply paying a part of the purchase money for the land. It is precisely the same thing as if he had paid the.money to Nathaniel Edwards, and the latter had paid it upon the trust debts. Such payments, necessarily operate as a satisfaction of the' debt and an extinguishment of the incumbrance pro . tanto, which can never be revived, merely because there is a change of circumstances. If John C. Edwards desired or intended to keep alive the incumbrances for his own benefit, he ought to have taken an assignment or transfer of the deeds of trust. Instead of that, he pays them *off in part, and in so doing his sole purpose was to extinguish the lien to that extent. How can this court now, after this lapse of time, revive it in favor of his assignee?
It may be conceded there are cases in which the purchaser of an equity of redemption, upon paying off an incumbrance, will be subrogated to the rights of the creditor, and a court of equity will keep alive the lien for his benefit, although it may have been discharged by payment. But these cases depend upon peculiar circumstances, which need not now be considered. And even when the purchaser takes an assignment, this does not necessarily entitle him to the protection of the mortgage. If it is his duty by the terms of the contract to pay and cancel the mortgage, it will be held to be a release and not an assignment. And when there is no such duty devolving upon him, the.assignment will be held to operate as an extinguishment or not, according to the intention and situation of the parties. Gibson v. Crehore, 3 Pick. R. 475; Brown v. Lapham, 3 Cush. R. 551. But when the purchaser takes no assignment, and his payments are made for the purpose of discharging the debt, and with no intention of keeping alive the mortgages, he cannot afterwards, upon a change of his intentions, or upon a 'change in the surrounding circumstances, insist upon the mortgage as a subsisting security to the injury of third persons. Jones on Mortgages, § 855, and cases there cited. And see Hatch v. Kimball, 16 Maine R. 146. These principles would seem to be decisive of the case.
But this is not all. The conduct of J. C. Edwards, throughout, was well calculated to lull the Orphan Asylum into a false security. If it had looked at the deed to him from Nathaniel Edwards, it would have seen that he purchased the property subject to all the deeds of *trust. If it had enquired of the parties, it would have been told that the arrangement was to pay all the debts. For ten years John C. Edwards made his payments to that institution precisely as if he regarded the debt as his own, and the deed of trust an incumbrance which he was required to satisfy. But for this conduct the *71 Orphan Asylum, might have redeemed the Cornick deeds of trust, for nothing is better settled than that upon paying the prior mortgage, the junior succeeds by right of subrogation to the lien of the former as a security for the sum paid without even an assignment. The Asylum might have bid for the property at the sale made in 1871, and thus have secured a part of its debt. But it was not until more than twelve years after the original transaction — not until the last sale was made in 1871, and the proceeds in the hands of trustee — that this claim was ever asserted. To what extent the Orphan Asylum may have been injured by this delay — what other measures it might have adopted for its protection, had it been apprized of this claim — it is impossible for us to say. It may be safely assumed that its conduct would have been very different from what it has been with reference to its debt. Under such circumstances, now to set up the Cornick deeds in favor of John C. Edwards or his assignee, would be to violate every rule of equity. The courts will not enforce the doctrine of subrogation where it will work injustice. 2 Washb. on Real Property, 198-20. As was said by Chancellor Kent in Star v. Ellis, 6 John. Ch. R. 393: “A court of equity will keep an incumbrance alive or consider it extinguished as will best serve the purposes of justice and the actual and just intention of the party. It must, at all events, be an innocent purpose, and injurious to no one.” Jones on Mortgages, 959, 963. And this is the language of all the authorities. Without multiplying citations upon *this point, or protracting discussion, T think the decree should be affirmed.
ANDERSON, J., dissented.
Decree affirmed.